JAY SMITH (CA Bar No. 166105)
(Email: js@gslaw.org)
LINDA S. FANG (CA Bar No. 240245)
(Email: lfang@gslaw.org)
**GILBERT & SACKMAN**
**A LAW CORPORATION**
3699 Wilshire Boulevard, Suite 1200
Los Angeles, California 90010
Tel:    (323) 938-3000
Fax:    (323) 937-9139

RICHARD P. ROUCO *(pro hac vice)*
(Email: rrouco@qcwdr.com)
**QUINN, CONNOR, WEAVER, DAVIES & ROUCO**
2700 Highway 280 East, Suite 380
Birmingham, Alabama 35223
Tel:    (205) 870-9989
Fax:    (205) 803-4142

Attorneys for Plaintiffs Rick Delagarza, Paul Gutierrez,
Sal Lucido, April Moore, Charles Grimmett, Antonio
Garcia, and Brian Cashwell

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO

| | |
|---|---|
| RICK DELAGARZA, individually, PAUL GUTIERREZ, SAL LUCIDO, APRIL MOORE, CHARLES GRIMMETT, ANTONIO GARCIA, and BRIAN CASHWELL, individually and on behalf of all similarly situated current and former employees,<br><br>        Plaintiffs,<br><br>    v.<br><br>TESORO REFINING AND MARKETING COMPANY and DOES 1 through 20, inclusive,<br><br>        Defendants. | Case No. C 09-05803 MHP<br><br>Assigned for all purposes to Hon. Marilyn Hall Patel<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**<br><br>Date:      July 18, 2011<br>Time:     2:00 p.m.<br>Location:  Courtroom 15, 18th Floor<br>            450 Golden Gate Avenue<br>            San Francisco, California 94102 |

## TABLE OF CONTENTS

I.     INTRODUCTION ......................................................................................................... 1

II.    STATEMENT OF ISSUE TO BE DECIDED ...................................................... 2

III.   BRIEF HISTORY OF THE LITIGATION ......................................................... 2

IV.   FACTS AND EVIDENCE IN SUPPORT OF CLASS ACTION TREATMENT ..................... 3

    A.    Tesoro's Operations at the Golden Eagle Refinery ........................................... 3

    B.    The Putative Class ...................................................................................................... 3

    C.    Tesoro's Recordkeeping and Payroll Systems .................................................. 5

    D.    Tesoro's Uniform Policies, Which Are Applicable to All Putative Class Members ....... 5

        1.    12-Hour Shift Employees Are Required To Be On Duty Throughout Their Shifts ................................................................................... 5

        2.    12-hour Shift Employees Are Required to Remain on the Refinery Premises and In or Near Their Work Areas Throughout Their Shifts ...................... 7

        3.    12-hour Shift Workers Are Required to Remain in Communication at All Times During Their Shifts ................................................................ 9

        4.    Operators Must Respond to Alarms At All Times During Their Shifts ................ 11

        5.    12-hour Shift Employees Are Subject to Uniform Policies That Prohibit Certain Activities During Their Work Shifts .......................................... 12

        6.    12-hour Shift Employees Do Not Have Scheduled or Designated Meal Periods and Tesoro Does Not Record When or Whether These Employees Eat ...................................................................... 12

        7.    Tesoro Does Not Have a Policy or Practice of Providing Relief For 12-Hour Shift Employees to Take Breaks .................................................. 14

        8.    There is No Meal Period Waiver or On-Duty Meal Period Agreement ................. 15

V.    THE APPLICABLE LAW GOVERNING PLAINTIFFS' CLASS CLAIMS ........................ 15

    A.    There Are Important Policy Concerns Behind California's Meal Period Laws ......... 15

    B.    Plaintiffs' Meal Period Claims Are Readily Susceptible to Class-Wide Proof ........... 16

VI.   CLASS CERTIFICATION IS APPROPRIATE IN THIS CASE ............................................ 18

    A.    The Proposed Class and the Claims Plaintiffs Seek to Litigate on a Classwide Basis ...................................................................................... 18

    B.    The Statutory Period for This Action Was Tolled By the Pendency of the *USW* Case .............................................................................................. 18

**C.** **This Action Satisfies All of the Requirements of Rule 23(a)** ......................................... 19

    1.    The Class is Sufficiently Numerous ....................................................... 19

    2.    Common Issues of Law and Fact Exist Under Rule 23(a)(2)................................ 20

    3.    The Proposed Class Representatives' Claims Are Typical of Those of the Class................................................................................................................... 20

    4.    The Class Representatives and Class Counsel Are Adequate ................................ 21

**D.** **This Action Satisfies All of the Requirements of Rule 23(b)(3)** .................................... 22

    1.    Common Questions Predominate As to Plaintiffs' Meal Period Claims ................ 22

    2.    Class Action Treatment is the Superior Method for Adjudicating this Case .......... 24

**E.** **The Proposed Class is Appropriately Certified Under Rule 23(b)(2)** .......................... 25

**VII.** **CONCLUSION** ............................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) ........................................... 22

*American Pipe and Constr. Co. v. Utah*, 414 U.S. 538, 553 (1974) ............................... 18

*Bono Enterprises, Inc. v. Bradshaw*, 32 Cal.App.4th 968, 975 (Cal.App. 5 Dist. 1995) .......................... 16

*Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983) ............................... 18, 19

*Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625, 633 (S.D. Cal. 2010) ........................... 20

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166, at *6 (N.D. Cal.) ........................... 22

*General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982) ........................... 21

*Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 647 (C.D. Cal. 1996) ........................... 20

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) ........................... 19, 20, 21, 22

*Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) ........................... 21

*Hatfield v. Halifax*, 564 F.3d 1177, 1185 (9th Cir. 2009) ........................... 19

*Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D. Cal. 1988) ........................... 19

*Morillion v. Royal Packing Co.*, 22 Cal.4th 575, 586 (2000) ........................... 16

*Murphy v. Kenneth Cole Productions, Inc.*, 40 Cal.4th 1094, 1113 (2007) ........................... 15, 16

*Sav-On Drug Stores v. Superior Court*, 34 Cal. 4th 319, 340 (2004) ........................... 24

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ........................... 21

*United Steel, et al. v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010) ........................... 18, 24

*Wang v. Chinese Daily News*, Inc., 231 F.R.D. 602, 607 (C.D. Cal. 2005) ........................... 19

*Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 754 (9th Cir. 2010) ........................... 25

*Watkins v. Ameripride Servs.*, 375 F.3d 821, 825 (9th Cir. 2004) ........................... 16

*Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001) ........................... 18

**Statutes**

28 U.S.C. § 1332 ........................... 19

California Labor Code § 201 ........................... 1, 18

California Labor Code § 202 ........................... 1, 18

California Labor Code § 203 ............................................................................................... 1, 18

California Labor Code § 226.7 ........................................................................................ 1, 16, 17

California Labor Code § 512 ........................................................................................... 1, 16, 17

California's Unfair Competition Law ("UCL"), Bus. & Prof. Code § 17200 *et seq.* ............................. 1, 18

Federal Rules of Civil Procedure 23 ...................................................................................... *passim*

Wage Order 1-2001 ......................................................................................................... *passim*

TO THE HONORABLE MARILYN HALL PATEL, ALL PARTIES, AND THEIR COUNSEL:

PLEASE TAKE NOTICE that on July 18, 2011, at 2:00 p.m., in Courtroom 15 of the above-entitled Court, at 450 Golden Gate Avenue, San Francisco, California, Plaintiffs Paul Gutierrez, Sal Lucido, April Moore, Charles Grimmett, Antonio Garcia, and Brian Cashwell will and hereby do move this Court for an order, pursuant to Federal Rule of Civil Procedure 23, certifying their claims for violations of California's Unfair Competition Law ("UCL"), Bus. & Prof. Code § 17200, *et seq.*, and failure to provide meal periods, as required by California Labor Code sections 512 and 226.7 and IWC Wage Order 1-2001 section 11, on behalf of a plaintiff class defined as:

> All current and former shift employees of Defendant Tesoro Refining and Marketing Company who worked at least one 12-hour shift, excluding any shifts worked as temporary shift supervisors, since April 25, 2004, at the Golden Eagle refinery and chemical plant operated by Defendant.

Plaintiffs will also move this Court to certify a subclass for failure to pay all wages due at the time of discharge or resignation, as required by California Labor Code sections 201, 202, and 203, defined as:

> All former shift employees of Defendant Tesoro Refining and Marketing Company who worked at least one 12-hour shift, excluding any shifts worked as temporary shift supervisors, since April 25, 2004, at the Golden Eagle refinery and chemical plant operated by Defendant, and whose employment has been terminated by discharge or resignation.

This motion is based on this notice, the attached memorandum of points and authorities, the declarations of Linda S. Fang, Jay Smith, and Richard P. Rouco, with the attached exhibits and witness declarations, filed concurrently herewith, all pleadings and documents on file in this action, and on such additional evidence as will be presented in Plaintiffs' reply brief and at the hearing on this motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Defendant Tesoro Refining and Marketing Company ("Tesoro") has operated the Golden Eagle refinery located in Martinez, California since 2002. To carry out the oil refining process 24 hours a day, 365 days a year, Tesoro employs hundreds of 12-hour shift employees who comprise the putative class and are responsible for continuously monitoring the process, responding to any emergencies that arise, and maintaining the safe and stable operations of the refinery. Tesoro requires these employees to be on duty throughout their 12-hour shifts, and for good reason, as they have one of the most dangerous jobs in the world, handling volatile chemicals under very high pressure and at searing temperatures.

Because the refinery cannot operate without qualified personnel to monitor the refining process and respond to emergencies at all times, Tesoro requires these 12-hour shift employees to remain at the refinery throughout their shifts, stay in communication at all times, and refrain from doing anything that would interfere with their ability to respond to conditions in the units. Plaintiffs contend that, as a result of the common policies, Tesoro failed to provide them with two off-duty 30-minute meal periods or pay an extra hour of pay in lieu thereof, and failed to pay wages due to former employees upon separation.

As two other courts have found, class treatment is warranted here because Plaintiffs' theory of liability is common to the class and their claims can be established in a manageable trial using common proof of Tesoro's uniform policies that are applicable to all putative class members. By relying on collective proof, including the testimony of Tesoro's representatives and corporate policies and records, common issues of fact and law predominate over any individualized inquiries. Therefore, the class action procedure will provide an efficient mechanism by which to adjudicate this case.

## II.   STATEMENT OF THE ISSUE TO BE DECIDED

The issue to be decided is whether the proposed class should be certified for purposes of litigating Plaintiffs' meal period, waiting-time penalty, and Unfair Competition Law claims – specifically, whether the requirements of Rule 23(a) and at least one of the requirements of Rule 23(b) are satisfied.

## III.   BRIEF HISTORY OF THE LITIGATION

On April 25, 2008, the United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service Workers International Union, AFL-CIO, CLC ("USW"), and two employees filed a putative class action against two Shell defendants and Tesoro ("the *USW* case"), *United Steel, et al. v. Shell Oil Co., et al.*, USDC Case No. 08-cv-03693 RGK. Fang Decl. ¶ 9; Complaint, Ex. 2 to Fang Decl. The complaint alleged meal period violations and other claims on behalf of current and former employees who worked at three refineries operated by Shell and Tesoro. *Id.* On August 21, 2009, the Honorable R. Gary Klausner denied the *USW* plaintiffs' motion for class certification, finding, *inter alia*, that the proposed class would be unmanageable. Fang Decl. ¶ 10; Order, Ex. 3 to Fang Decl. Thereafter, on August 27, 2010, Judge Klausner granted the *USW* plaintiffs' motion for partial summary judgment and, on March 23, 2011, entered judgment against Shell and Tesoro on the two employees' meal period, wage statement, and UCL restitution claims. Fang Decl. ¶¶ 11, 12; Exs. A, B to Req. for Jud. Notice ("RJN").

1    Following the denial of class certification in the *USW* case, other employees of Shell and Tesoro

2    filed four new putative class actions alleging meal period violations and other claims on behalf of shift

3    employees of each employer at each refinery. Fang Decl. ¶ 13. Of these cases, <u>both</u> federal district court

4    judges who have considered the issue to date have found class certification to be appropriate: On January

5    27, 2011, at the class certification hearing in the case filed on behalf of shift employees at Shell's refinery

6    in Martinez, California, the Honorable Claudia Wilken of the Northern District of California stated on the

7    record that she will be certifying the case as a class action. *Id.*; *see* Transcript of Class Cert. Hrg, Ex. 4 to

8    Fang Decl., at 2:24-25 (observing that "this is just really not even a close question. [The case i]s clearly

9    certifiable"), 9:5-6 (certifying class). On March 28, 2011, the Honorable Valerie Baker Fairbank of the

10   Central District of California certified the meal period and UCL claims (the same claims as in this action)

11   on behalf of a class of 12-hour shift employees at Tesoro's Los Angeles refinery. Fang Decl. ¶ 13; *see*

12   Tentative Ruling, Minutes (adopting the tentative ruling), and Order (certifying class), Ex. C to RJN.

**IV.    FACTS AND EVIDENCE IN SUPPORT OF CLASS ACTION TREATMENT**

13

14       **A.    Tesoro's Operations at the Golden Eagle Refinery**

15       Tesoro has operated the oil refinery and chemical plant located in Martinez, California ("Golden

16   Eagle refinery") since 2002. Gonzalez Tr. 36:2-3. The Golden Eagle refinery operates continuously, 24

17   hours a day, 365 days a year. *See* Hanson Tr. 20:16-25; Brunell Tr. 35:9-16.

18       **B.    The Putative Class**

19       The putative class is comprised of Tesoro's current and former shift employees who have worked

20   12-hour shifts at the Golden Eagle refinery since April 25, 2004. *See* Complaint, p. 2, Ex. 5 to Fang Decl.

21   Shift employees, who are tasked with maintaining the safe, stable operation of the refining process, work

22   12-hour shifts, alternating between day and night shifts. 2002 CBA, § 3.021, TG0010, Ex. 6 to Fang

23   Decl.; Brunell Tr. 115:2-10. 12-hour shift employees are paid for all hours worked. Garcia Tr. 137:2-5.

24       At the Golden Eagle refinery, there are approximately 250 to 300 12-hour shift employees. *See*

25   Hanson Tr. 124:21-125:4. 12-hour shift employees work in one of three main areas of the refinery, which

26   are divided into units – (1) Heavy Oils (50 Unit, Crude Complex, Cracking, Cat Cracker, 4 Gas, Coker, 5

27   Gas, Chemical Plant), (2) Light Oils (Hydrocracker, 3 HDS, HDS Complex, Alkylation, LHP, Reformer),

28   and (3) Logistics (Utilities, Gauging, Shipping, Waste Water Treatment Plant, API). 2009 CBA, TG2501,

Ex. 8 to Fang Decl.; Hanson Tr. 95:4-99:24; Garcia Tr. 10:25-11:12; Brunell Tr. 10:14-11:5; Bishop Tr. 5:25-6:6. To keep the refinery operating continuously, each unit has four crews of 12-hour shift workers who rotate between day and night shifts, and every crew on every shift must have certain minimum "crew positions" filled at all times. Chappell Tr. 23:10-13; Garcia Tr. 40:11-41:3, 53:15-22. Shift employees must complete a rigorous training program before they may be assigned to crew positions. *See* Operator Training Plan and Qualification Checklist, TG017767-79, Ex. 10 to Fang Decl.; Brunell Tr. 49:8-12.

There are four basic types of crew positions: Board Operator, Field Operator, combination Board/Field Operator, and Head Shift Operator (also referred to as Super #1). Board Operators sit at control boards, called "consoles," inside a control center and continuously monitor and make adjustments to the levels, pressures, temperatures, and other indicators on equipment, products, and processes in their units. Brunell Tr. 116:18-117:12 (describing Board Operator duties); Alkylation Plant Operating Manual[1] ("Alky Manual"), TG012392, Ex. 11 to Fang Decl. (describing the console system); No. 4 Gas Plant Operating Manual ("4 Gas Manual"), TG004591-612 Ex. 12 to Fang Decl. (console screens); Lagance Decl. ¶ 4; Moore Decl. ¶ 5. Field Operators work out in the units and in field control rooms and they are responsible for maintaining, monitoring, inspecting, and making adjustments to equipment at the direction of Board Operators and Head Shift Operators. Brunell Tr. 92:8-23; No. 3 Crude Unit Operating Manual ("3 Crude Manual"), TG010208-19, Ex. 13 to Fang Decl.; Heinz Decl. ¶ 4; Bartling Decl. ¶ 4. Board and Field Operators rely on each other to isolate and resolve problems in the unit because Board Operators cannot inspect or make manual adjustments to equipment from the control room and must rely on Field Operators to be their eyes and ears outside in the unit, while Field Operators must rely on Board Operators, who monitor the units from consoles, to identify potential and actual emergency situations. Brunell Tr. 120:25-121:7 (Board and Field Operators share responsibility for making sure units operate safely); Hanson Tr. 166:13-24 (Field Operators are the human interface with the processing equipment); Cracking Area Operating Manual ("Cracking Manual"), TG013622, Ex. 14 to Fang Decl. ("Operators

---

[1] Tesoro has Operating Manuals for each of the operating units, which provide an explanation of the processes, equipment, and Operators' job duties and responsibilities that are necessary to "operate the plant in a safe, efficient, reliable and environmentally sound manner." *See, e.g.,* Alky Manual, TG012243; Keith Tr. 28:24-29:1, 30:1-4 ("Q. [T]he Operations manual will set out what the operator is supposed to do, for example, to run a specific unit; right? A. Yes."); Bartling Decl. ¶ 3; Nickels Decl. ¶ 3. Tesoro produced Operating Manuals for 18 units. However, in order to avoid overburdening the Court, Plaintiffs have submitted a limited sampling of these manuals with their motion.

share the responsibility of environmental protection …. This is accomplished by exchange of information and taking appropriate action when abnormal conditions exist."); Moore Decl. ¶ 6; Bartling Decl. ¶ 5. Some units have crew positions with board and field duties. Garcia Tr. 99:11-100:6; Brunell Tr. 63:16-20; Hofacre Decl. ¶ 6; Higgins Decl. ¶ 3. Board/Field Operators are required to know what is going on in their units at all times and to ensure that all tasks needed to operate their unit, whether it be on the console or in the field, are completed in a safe and efficient manner. Grimmett Decl. ¶ 4; Hofacre Decl. ¶ 6. Some units have Head Shift Operators, who are responsible for overseeing and coordinating the overall operations of the unit. Brunell Tr. 107:7-20, 95:21-25; Garcia Tr. 72:23-73:9. HSOs must be qualified to work on all of the crew positions in their units so they can provide direction to Board Operators and Field Operators and take over any position as necessary. Garcia Decl. ¶ 4; Hanson Tr. 58:8-11.

In contrast to 12-hour shift employees, there are other people at the refinery, such as maintenance employees and Operators working on special projects, who are not part of the proposed class. These "day workers" work only day shifts on weekdays and their schedule typically includes an unpaid 30-minute meal period. *See* 2002 CBA, § 3.032, TG0010; Hanson Tr. 19:16-20, 189:4-7; Lagance Decl. ¶ 13.

**C.    Tesoro's Recordkeeping and Payroll Systems**

Tesoro has a payroll and timekeeping system at the Golden Eagle refinery, called the Labor Tracking System, which keeps track of employees' hours, schedules, shifts worked, and rates of pay since at least 2004. Gonzalez Tr. 12:10-14, 26:21-28:9, 31:16-32:2, 35:20-36:4. Tesoro does not keep records of when or whether Operators eat during their shifts. Brunell Tr. 139:17-140:4; Bishop Tr. 97:16-98:1; Hanson Tr. 182:2-4; Gutierrez Decl. ¶ 14; Parle Decl. ¶ 10. Tesoro has no procedure for paying and has never paid employees an extra hour of pay for a missed meal period. Gonzalez Tr. 38:13-22; 55:22-56:4[2]; Nickels Decl. ¶ 12; Richardson Decl. ¶ 10.

**D.    Tesoro's Uniform Policies, Which Are Applicable to All Putative Class Members**

      1.    <u>12-hour Shift Employees Are Required To Be On Duty Throughout Their Shifts</u>

12-hour shift employees are required to remain on duty throughout their shifts, including when they eat. Keith Tr. 64:25-65:4 ("Q. [W]ould you agree that it's -- the operators who are assigned to a unit

---

[2] Notably, Tesoro fails to comply with the meal period requirement even for day workers, who have scheduled 30-minute meal breaks. Tesoro's payroll representative admits that Tesoro does not pay the extra hour of wages for day workers who miss meal periods. Gonzalez Tr. 42:13-43:22, 45:12-46:5.

remain responsible for their units until the oncoming shift relieves them? A. Yes."), 105:10-13 ("Q. [D]o operators get relieved of all duties for the purposes of eating a meal? … A. No."); Brunell Tr. 152:12-16 ("[W]e have talented people here that I think can eat and maybe keep a casual eye on something. I don't know that there's just eating as an all-exclusive occupation for anyone, but have you ever eaten and driven your car, you know?"); Nickels Decl. ¶¶ 9-10; Hofacre Decl. ¶¶ 9-10; Heinz Decl. ¶¶ 7-8. Because the refining process runs continuously, 12-hour shift employees must be available at all times to monitor the process, respond to any problems, and keep the refinery running. Hanson Tr. 23:16-19 (12-hour shift workers are paid to watch the refining process 24/7); Brunell Tr. 155:14-156:7 (comparing the duties of Operators to those of firemen – "[W]e have a piece of equipment that we're monitoring 24 hours a day whereas they're waiting for a call …. We probably have to be more attentive than [firemen] do on the downtimes."); Alky Manual, TG012426 ("Operators must be vigilant at all times, to make sure all such signs [of contamination] are detected early, and dealt with promptly."), TG012485 ("During the day-to-day operation of the unit[s], problems occur which will require operator intervention. These problems can range from equipment failure, process disturbance, … unit upsets, and other unexpected events. … When problems are discovered, appropriate actions must be taken immediately."); No. 2 Reformer Operating Manual ("2 Reformer Manual"), TG009731, Ex. 15 to Fang Decl.; Keith Tr. 63:19-25. During their shifts, there is no time when 12-hour shift employees are relieved of their duties or their responsibility over their units, even when operations appear stable. Shipping Department Operating Manual ("Shipping Manual"), TG016623, Ex. 16 to Fang Decl. ("[C]onstant vigilance is required."); Keith Tr. 103:1-11 ("Q. [When] would an outside operator be completely relieved of their duties? A. It could be finishing up his [required computer-based training]. … He can be doing his yearly respiratory physical. Let's see. That's the only two that come to mind right now."); Chappell Tr. 67:20-25; Brunell Tr. 162:7-13.

One of the most important duties of 12-hour shift employees is to maintain the stability of their units and keep the refinery running safely. *See, e.g.*, Cracking Manual, TG013487 ("[T]he Cracking Area is a complex and challenging area that requires the operator's constant attention."); 4 Gas Manual, TG4545 ("Preventing an environmental impact relies directly on keeping the process parameters within specified guidelines, and correct operator response on the board and in the field. Any uncontrolled leak, atmospheric emission or a spill is considered an environmental hazard."); Alky Manual, TG012396

("Since so many players are involved, the system can easily get into imbalance. … The Alky operators need to be vigilant, and do the best they can to maintain sound system operations."), TG012425 ("All refining process performs best when steps are taken to optimize the reaction conditions. … The primary goal of an alky plant operator is to make sure the plant runs safely and reliably."). Because the refining process runs continuously, 12-hour shift employees must constantly monitor the process to proactively identify or forestall potential problems, as non-urgent situations can quickly turn critical if not properly monitored. Shipping Manual, TG016661 ("Proactive management to prevent any spill to water has been the emphasis by the government agencies for many years. In fact, to impress upon facility operators the seriousness of their intent, wharf personnel can now be personally held liable for negligent actions that lead to a spill."), TG016662 ("Any person discovering a spill or fire should act quickly to take whatever steps possible and reasonable to stop or contain the emergency and alleviate dangerous conditions. Prompt response to a spill is essential to protect life, property, and the environment."); 2 Reformer Manual, TG009811 ("Spotting problems before they occur, and preventing impending failure from developing into a major event, is the challenge that faces every Operating Department employee."); Alky Manual, TG012426 ("Operators must be vigilant at all times, to make sure all signs are detected early, and dealt with promptly."); Gutierrez Tr. 29:8-24 (not every piece of equipment is connected to an alarm and it must be constantly monitored visually); Lucido Tr. 80:5-18 (Operators must proactively monitor their processes to catch problems before they become extreme).

   2.  <u>12-hour Shift Employees Are Required to Remain on the Refinery Premises and In or Near Their Work Areas Throughout Their Shifts</u>

   12-hour shift employees are required to remain on the premises of the Golden Eagle refinery and in or in close proximity to their work areas throughout their shifts. Hanson Tr. 178:5-8 ("Q. Are the shift workers allowed to leave the premises during their shift? A. No. We're paying them to be on site for that twelve[] hours."); Basic Rules of Conduct,[3] TG6365, Ex. 17 to Fang Decl. ("Leaving the assigned work area without permission of a Supervisor is prohibited."); Brunell Tr. 129:4-11 (Operators working in crew positions are required to remain in the refinery during their shifts); 134:19-135:25 ("Q. … [U]nder

---

   [3] Tesoro's written policy called "Basic Rules of Conduct" governs all employees at the Golden Eagle refinery. Hanson Tr. 169:21-170:6; Bishop Tr. 108:5-8; Rules and Standing Instructions, Acknowledgement Form, New Hire Orientation, TG017244 (Basic Rules of Conduct included in orientation packet for new hires), Ex. 22 to Fang Decl.

what kind of circumstances are [Operators] allowed to leave their units? A. … It's -- essentially they're not allow[ed] to leave for any convenience. It's usually job related or urgent."); Keith Tr. 56:23-57:11 ("Q. -- is it the expectation that the board operator will stay in the central control room building? A. Yes. … If the board operator's going to leave the centralized control room, one of the first things he has to do is get my permission. … And he better have a good reason for going to the unit because that's not his job. His job is to be in the centralized control room."), 82:10-83:3; Heinz Decl. ¶ 12; Parle Decl. ¶ 13. 12-hour shift employees are required to remain in the refinery and near their work areas during their shifts so they can be physically present and available to respond at all times. Rios Tr. 37:15-25 ("Q. [D]uring their shift [Operators are] required to remain available to other co-workers or supervisors if needed? A. … Right. They were expected to be at work.… [and] they were expected to be in the facility where someone could find them if so desired."); Hanson Tr. 178:5-8. It may be possible, on rare occasions, for Operators to leave the refinery or their work areas if they obtain permission from their supervisor and arrange for a qualified Operator to relieve them of their duties. Keith Tr. 57:5-7, 106:2-16 ("Q. ... [I]f there's a board operator working on a unit position in a crew, under what circumstances are they allowed to [leave]?… A. …Only if they're relieved … [by a] Qualified person doing their job. Q. So if there's no qualified person available to do their job -- A. He ain't going."); Basic Rules of Conduct, TG6365 ("Leaving a process unit as designated without proper authorized relief or permission of a Supervisor is prohibited."); Feldermann Decl. ¶ 12 ("I have never heard of an Operator, who was working in a crew position, leaving the refinery or his or her work area without permission and proper relief, and I believe that if it happened it would be viewed as job abandonment and result in termination."); Moore Tr. 22:7-22 (she has only left the refinery once during a shift); Johnson Tr. 77:3-8; Richardson Decl. ¶ 12; Lucido Decl. ¶ 14.

12-hour shift employees typically eat at or near their work areas. Hanson Tr. 152:4-14 (Operators who work in the Central Control Room eat at their workstations or in the kitchen located right next to their work area); Garcia Tr. 98:19-99:2 (Board Operators more typically eat at their desk than in the kitchen), 102:12-103:7 (Field Operators eat at their desks in their field control room); Keith Tr. 70:5-24; Rios Tr. 44:5-8; Gutierrez Tr. 80:17-21; Delagarza Tr. 45:20-25; Moore Decl. ¶ 8 ("As a Board Operator …, I ate at the desk next to my console, monitoring my console while I ate."); Parle Decl. ¶ 8 (same); Bartling Decl. ¶ 7 ("When I can eat, I eat in the Alky Complex field control room."). In the buildings

where 12-hour shift employees work, the kitchen facilities are steps away from their work areas. Hanson Tr. 151:21-25 (kitchen in the Central Control Room is "right off the work area"), 152:17-19, 153:1-5 (most of the kitchens in the field control rooms are adjacent to the work area); Korthals Tr. 25:21-23 ("Q. ... Now, the kitchen area, how close is that to the control room in the central control room? A. Two inches. ... It's the thickness of a pane of glass. It's right there."); Keith Tr. 72:18-73:9 ("Q. Now, with respect to a console operator eating in the kitchen, do they need somebody to relieve them of their duties in order to eat in the kitchen? A. No. ... Because they can -- they can see their unit. They have their radio."); Garcia Tr. 82:17-19; Gutierrez Tr. 22:15-25. There is no place at the refinery for Operators to eat away from their control rooms. Brunell Tr. 90:22-91:8 ("Q. Is there a location in the refinery away from the control rooms ... where operators can go to eat? ... Like a cafeteria building. A. No. ... Q. -- or an area where they have vending machines and tables ... ? A. No.").

      3.    <u>12-hour Shift Workers Are Required to Remain in Communication at All Times During Their Shifts</u>

Board and Field Operators work as a team and depend on each other to resolve problems in the unit. Keith Tr. 64:15-24 (Board and Field Operators in a unit work as a team and communicate with each other); Cracking Manual, TG013488 ("[T]he Cracking Area Pumper must be capable of understanding and operating key parts of several Refinery-wide systems, and of working closely with operators all over the Golden Eagle Refinery Complex."); 2 Reformer Manual (Operators must "[c]ommunicate and update other plant personnel of abnormal conditions that may require immediate assistance."); Shipping Manual, TG016676 ("Excellent planning and communications are required to ensure that the utmost in safe operations and environmental compliance is achieved at all times."). Because the units at the Golden Eagle refinery are interconnected, an upset in one unit can quickly affect other units. Chappell Tr. 21:22-22:1 ("Everything out here affects everything. ... The entire refinery is interconnected."); Brunell Tr. 43:23-44:1 ("[T]he refinery is divided up into areas, but every area affects every other area. We are one big machine. So all the areas need to know what's going on. Even if it's not their area, it may affect their area."). Constant communication between Board and Field Operators in a unit, and between Operators in different units is crucial to the safe operation of the Golden Eagle refinery. Alky Manual, TG012348 ("Good communications among operators of different units can help reduce or eliminate environmental incidents."); Bishop Tr. 106:5-15; Brunell Tr. 44:13-16; Higgins Decl. ¶ 7; Moore Decl. ¶ 7.

12-hour shift employees are required to stay in communication with their co-workers at all times during their shifts. Brunell Tr. 72:23-24 ("We all have radios. We are all in contact at all times."), 123:18-20 ("[Radios are] a piece of equipment that's integral to [Operators'] jobs."), 123:22-24, 124:10-25 ("Q. … Are there phones at the local control rooms? A. Yes. Q. And so operators can also be reached by the phone that need be? A. If they're in the field control room, yes. Q. How about the board operators, how do they communicate with the other operators that are working on the unit? A. Most commonly by radio. Q. So is there a radio in the central control room that each board operator has access to? A. Yes. Each console has a radio on the frequency of their unit. They also have a handheld radio that could be taken with them and they can switch frequencies if needed to communicate with other units."); Gutierrez Tr. 65:11-16 (Wharf Operators required to carry two radios during transfer and one radio at all other times); Garcia Tr. 68:6-8; Bishop Tr. 53:12-54:3. Because emergencies can occur at any time, 12-hour shift employees are required to keep their radios with them and turned on, and to respond to calls at all times, regardless of what else they are doing. Alky Manual, TG012338 ("Two-way radios should have a freshly recharged battery at the beginning of each shift."); 2 Reformer Manual, TG009624 (same); 3 Crude Manual, TG010017 (same); 4 Gas Manual, TG004535 (same); Cracking Manual, TG013613 (same); Johnson Tr. 100:14-23 ("Q. … When an operator receives a radio call, are they required to respond to the radio call? … A. To respond. Yes."), 101:17-22 ("Q. [I]f they get a call on the phone, are they expected to answer it even if they're eating a meal? … A. Yes."); Gutierrez Tr. 65:17-66:3; 66:8-21 ("Q. [H]ave you ever received a call on the radio that you were able to say I'm having -- I'm finishing … up my meal or making a meal and I'll get back to you in a few minutes? A. … [I]f it had something to do with … a job duty, then I would not feel I had the luxury to say, 'Give me some time to finish my meal, I'll get -- I'll get with you when I do.'"); Delagarza Tr. 48:3-8; Moore Tr. 60:23-61:4; Bishop Tr. 70:25-71:6; Richardson Decl. ¶ 6 ("I must remain in communication regardless of what I am doing, including when I am going to the bathroom or eating."); Lucido Decl. ¶ 8 (similar). While not all calls are critical, 12-hour shift employees must, at minimum, respond to calls to determine what action is required. Bishop Tr. 39:22-40:12 ("Q. … [R]egardless of what they're doing, if they get a call, the expectation is they're going to answer if they can; is that right? … A. Yes."); Delagarza Tr. 48:3-20 ("Q. Sometimes you would get calls that required immediate response; is that right? A. Sure. Q. Sometimes you would get calls that

didn't require immediate response? A. I wouldn't know that until I called them."); Moore Tr. 70:25-71:3

(took radio with her to the bathroom); Grimmett Tr. 98:1-4; Garcia Decl. ¶ 8; Gutierrez Decl. ¶ 11.

4.  Operators Must Respond to Alarms At All Times During Their Shifts

The Golden Eagle refinery has alarms that indicate emergencies or problems with the units, such

as where a unit's processes or equipment are operating outside their safe operating limits. Brunell Tr.

53:4-55:2; Keith Tr. 24:15-25:16; *see* Alky Manual, TG012352 ("Alarms have been installed throughout

the process to monitor critical points of the unit. When an alarm sounds, it can mean that a set point has

been exceeded, or a change in the process condition has occurred, or that a piece of equipment has been

shut down."); Critical Operating Limits, TG017588, Ex. 23 to Fang Decl. (to prevent catastrophic events

from occurring, OSHA requires refineries such as Golden Eagle to establish safe upper and lower limits

for temperatures, pressures, flows, and compositions), TG017590; Bartling Decl. ¶ 5; Nickels Decl. ¶ 7.

These alarms are unpredictable and they can go off at any time of the day or night. Chappell Tr. 28:4-7;

Brunell Tr. 59:5-13; Garcia Tr. 46:22-47:11. Operators must respond immediately to alarms, regardless

of what else they are doing. Brunell Tr. 140:13-18 ("Q. How about an alarm going off on the console,

would an operator need to acknowledge or respond to the alarm even while they're eating? A. That is

their job."); Johnson Tr. 101:25-102:5 ("Q. … With respect to the operators who are in the control room,

if they're eating a meal and an alarm goes off, are they expected to acknowledge the alarm? … A. Yes.

We expect for them to do that."); Lucido Tr. 86:16-87:6 ("Q. And what's the response time that you're

required to have if you hear an alarm? Let's say you're 500 yards away. Do you have to sprint over there

or what is the task? A. Yes, you do … it's very important to respond as quickly as possible to all

alarms."); Grimmet Tr. 60:20-23 ("Q. … What would you do, if you heard an alarm? A. Head back to the

control room."). In units with Board/Field Operators, who have both board and field duties, there are

audible alarms that can be heard for miles so that the Operator will be alerted even when he is out in the

field. Bishop Tr. 95:22-96:2, 102:17-103:11; Delagarza Tr. 25:17-20; Grimmett Tr. 33:7-8. When alarms

go off, Board Operators are required, at the very least, to acknowledge the alarm and investigate the

cause. Bishop Tr. 44:10-22, 95:14-21; Lucido Tr. 89:7-14 ("Q. And are there alarms that go off that don't

require you to do anything? A. Never. … I have to cancel it, observe it, do something about it."), 159:16-

20 ("Q. So are there times when an alarm will go off and then just self-correction, the pH may be off, but

by the time you get there, it's kind of corrected itself. A. Never. I never seen that happen."); Alky Manual, TG012432 ("[D]isturbances in the process can occur because of equipment failure, routine maintenance, feed variations, etc. As these deviations occur, operators must be prepared to compensate and correct the operating parameters that deviate from their required specifications."), TG012432-64 (listing operating limits, consequences of deviation, and required operator response), TG012465-80 (alarm descriptions and operator response); Lagance Decl. ¶ 6; Parle Decl. ¶ 6.

> 5.   12-hour Shift Employees Are Subject to Uniform Policies That Prohibit Certain Activities During Their Work Shifts

12-hour shift employees are not allowed to do anything during their shifts that would interfere with their ability to monitor their units, respond to radio calls or unit upsets, and perform other work duties at all times. *See* Electronic Data and Communications Security Procedure, TG6360, Ex. 18 to Fang Decl. ("Personal phone calls during working hours distract employees from their job responsibilities and can be disruptive to co-workers. Employees should, therefore, limit the placing or receiving of personal calls during working hours."); Reading While at Work, TG6363, Ex. 19 to Fang Decl. ("Reading must not distract from the timely performance of any job duty at any time. Reading of non-work related materials is prohibited Monday through Friday between the hours of 6 a.m. and 3:30 p.m."). 12-hour shift employees are not allowed to sleep during their shifts. Basic Rules of Conduct, TG6364 ("Sleeping during work hours is prohibited."); Brunell Tr. 133:3-5; Korthals 14:10-18; Johnson Tr. 93:25-94:4. 12-hour shift employees are not allowed to watch television or movies during their shifts. Brunell Tr. 138:18-139:2; Basic Rules of Conduct, TG6364 ("Possesion or use of … televisions without permission is prohibited."). 12-hour shift employees may not use headphones or other devices that would prevent them from hearing calls, alarms, or their fellow co-workers. Keith Tr. 115:4-10; Lagance Decl. ¶ 10.

> 6.   12-hour Shift Employees Do Not Have Scheduled or Designated Meal Periods and Tesoro Does Not Record When, Whether or How Long These Employees Eat

12-hour shift employees at the Golden Eagle refinery do not have scheduled or designated meal periods, and they eat when their work allows. Central Control Room Meal/Break Practice, TG2463, Ex. 20 to Fang Decl. ("As we move into the CCR everyone needs to understand what is expected …. Meal breaks will continue to be as they are now. Since Operators do not have a paid lunch period, you eat as conditions allow."); Gutierrez Tr. 53:6-7 ("There is no specific meal period. I eat when I can."), 67:5-9 ("[I]f there's work to be done, that takes precedence over your meal."); Brunell Tr. 155:4-13 ("[T]he unit

would take priority over eating. If something happened, an emergency, you would certainly put your food down and address the emergency."); Hanson Tr. 173:24-174:6; Bishop Tr. 57:15-23, 98:3-8; Hofacre Decl. ¶ 9; Feldermann Decl. ¶ 7. 12-hour shift employees do not have designated meal periods because their jobs are unpredictable and their duties are continuous; for example, when a 12-hour shift employee receives an alarm or a call, it is impossible to predict how long it would take to resolve the situation – it could be minutes for minor assignments, or the entire shift for major upsets. Grimmett Tr. 58:14-59:4 ("Q. [H]ow much time would it take to resolve [a unit issue]? A. Anywhere from 20 minutes to days."), 79:11-18 ("I would try to eat whenever I could work it in. If I thought maybe I might have ten or 15 minutes, I would run and try to get a bite to eat. If that didn't work out, then I would go back later. When the maintenance people were gone, a lot of times I would try to catch up with some of my other work without being disturbed, because you had to respond whenever they called you."); Brunell Tr. 162:7-13. Because 12-hour shift employees do not have a scheduled or designated meal period and no one keeps track of when, whether, or how long they eat, they are just as likely to receive radio calls and work assignments when they are eating as at any other time during their shifts. Grimmett Tr. 80:15-22, 89:6-14 ("Q. [W]as there ever a time when someone called you and wanted you to do something and you said, 'Hey, I'm in the middle of a meal here, you know, can't it wait 15, 20 minutes, 30 minutes,' …? A. No."); Nickels Decl. ¶ 10 (meals interrupted by non-urgent matters such as low-level alarms, radio calls, or contractors needing permits or assistance with equipment).

Operators are required to monitor their units throughout their shifts, even when they are eating; if they receive a radio call, an alarm, or a work instruction while they are eating, they must stop eating and respond. Johnson Tr. 105:15-21 ("Q. Can [Operators] eat and monitor their screens at the same time? A. Yes, they can. Q. Okay, so if they're sitting where their screens are, it's possible for them to eat and monitor what's going on? A. Absolutely."); Grimmett Tr. 81:7-9 ("[I]f you're eating and something goes wrong, you're going to get up out of there and go take care of it."), 88:16-21; Lucido Tr. 99:3-9 ("Q. And how much time do you take for your meal on the day shift on an average basis? A. I sit in front of my screen with my microwave meal and it takes me about ten minutes, while I'm observing my unit … and cancelling alarms. And, of course, reacting immediately to any emergency that might happen while I'm eating."), 156:24-157:3 ("Q. … Have you been interrupted before, when you've been eating a meal? …

A. Always. Lots of -- a lot of times."); Moore Tr. 60:23-61:4, 80:6-15 ("Q. … [W]hen you worked in the central control room, did you ever get any calls during the time that you were having a meal? A. Did I ever? Yes."); Parle Decl. ¶ 9; Higgins Decl. ¶ 9 ("If something happens in the unit, or if I receive a work instruction, I will put down my food and take care of it."). During upsets or other critical events, 12-hour shift employees may go an entire shift without eating at all. Grimmett 82:18-20 ("[Q]uite a few times I just didn't eat. I would be so busy that I just … did not eat."); Richardson Decl. ¶ 7; Garcia Decl. ¶ 9.

Supervisors do not keep track of when, whether, or how long 12-hour shift employees eat. Brunell Tr. 139:5:140:4 ("Q. Do you schedule when it is that an operator can take some time to eat? A. No. … Q. … [W]henever their work allows them? A. Absolutely. Obviously if we had some unit emergency, that would come first. These are dedicated people. The job comes first to them and they know that. They're very responsible in that regard. Q. Do operator have to record when or if they've had a meal? A. No. … Q. Do area supervisors record when operators take meals? A. No. When operators take meals is not something we track in any way."), 141:8-13 ("Q. If the area supervisors are not measuring the amount of time that operators take when they're eating meals, is there any way for the area supervisor to know whether the operator's had 30 minutes? … A. No."), 140:25-141:4. Tesoro does not maintain any written policies or practices educating employees or supervisors as to how many meal breaks employees are entitled to each shift. Hanson Tr. 182:13-24; Brunell Tr. 27:9-12, 142:13-20; Korthals Tr. 20:5-8; Bishop Tr. 43:11-22; Chappell Tr. 17:23-18:17; Keith Tr. 89:11-20.

7.     Tesoro Does Not Have a Policy or Practice of Providing Relief For 12-Hour Shift Employees to Take Breaks

Tesoro does not have a policy or practice of providing relief for 12-hour shift employees to take breaks. Hanson Tr. 192:2-8 ("Q. Do supervisors provide relief by assigning another employee to monitor an operator's console while that operator takes a meal? … A. To my knowledge, no supervisor does that, no."); Rios Tr. 26:1-16. Employees working alongside each other in the same unit often are not qualified on each other's jobs, so securing relief is not as simple as grabbing anyone who is available and willing. Brunell Tr. 41:3-5 ("We don't just put anybody [in a crew position on a unit] -- it's not just a warm body. It is someone who is qualified and knowledgeable and able to perform that job function."). For example, in addition to the Operators occupying the crew positions, some units may have a number of employees working weekday day shifts, such as Special Projects Operators ("SPOs") or Operator Helper Trainees

("OHTs"). Keith Tr. 53:12-16. However, these employees are not expected to – and do not – provide relief for other Operators to take meal breaks. Keith Tr. 100:19-102:1 ("Q. … [T]he extra operator isn't brought in to provide relief for people to eat meals; right? A. Correct. Q. Now, you mentioned there are Special Projects Operators; is that right? A. Correct. … Q. And they are not expected to provide relief for people to eat meals? A. Correct. Q. In fact, you don't -- the superintendent doesn't schedule these SPOs … to provide relief; right? A. Correct. The only time they'd ever work the job is an emergency when you need extra bodies."); Bishop 91:8-13; Lagance Decl. ¶ 13 ("SPOs have their own assignments and responsibilities, and would be able to provide relief only on rare occasions and for compelling reasons (such as a medical emergency)."); Nickels Decl. ¶ 15; Parle Decl. ¶ 15 ("Once OHTs become qualified on a crew position, their primary duty is to fill vacancies in the schedule …. Because there are frequently vacancies in the crew positions, it is very rare for the OHT to be just an "extra" Operator in the unit. Therefore, OHTs will rarely be both qualified and available to provide relief."); Lucido Decl. ¶ 16; Bartling Decl. ¶ 14 ("There are no designated individuals in the Alky Complex who provide relief for meal breaks."). Supervisors are not qualified to work any of the crew positions, and they are not allowed to perform bargaining unit work under the collective bargaining agreement. Keith Tr. 102:2-10; Brunell Tr. 13:15-14:6; 2002 CBA, TG0009-10; 2002 Chem Plant CBA, TG0110, Ex. 7 to Fang Decl.; Parle Decl. ¶ 16; Lagance Decl. ¶ 14.

Even if relief may sometimes be available or provided on specific occasions, it would not be practicable or appropriate for 12-hour shift employees to routinely request relief for two thirty-minute meal breaks every shift. Moore Tr. 74:6-14; Lagance Decl. ¶ 14; Parle Decl. ¶ 16.

     8. <u>There is No Meal Period Waiver or On-Duty Meal Period Agreement</u>

There has never been a meal period waiver or an "on-duty" meal period agreement between Tesoro and any putative class members. Rios Tr. 41:15-25; Nickels Decl. ¶ 12; Gutierrez Decl. ¶ 15.

## V. THE APPLICABLE LAW GOVERNING PLAINTIFFS' CLASS CLAIMS

### A. There Are Important Policy Concerns Behind California's Meal Period Laws

The California Supreme Court has held that break periods fulfill an important public policy concern affecting employee health and welfare. *Murphy v. Kenneth Cole Productions, Inc.*, 40 Cal.4th 1094, 1113 (2007) (noting "noneconomic injuries employees suffer from being forced to work through

rest and meal periods" and finding that "[e]mployees denied their rest and meal periods face greater risk of work-related accidents and increased stress"); *see* Amicus Curiae Brief of Former IWC Commissioner Barry Broad and Former DLSE Chief Counsel Miles Locker, in Support of Real Parties in Interest in *Brinker Restaurant Corp. et al. v. Superior Court*, No. S166350, 85 Cal.Rptr.3d 688, 2009 WL 3044402, at *2 (Aug. 26, 2009), Ex. D to RJN, pp. 2-36 (detailing history of meal period regulations in California from 1916 to September 2000, when the Legislature enacted Labor Code section 226.7). Courts have also found that "being forced to forgo rest and meal periods denies employees time free from employer control that is often needed to be able to accomplish important personal tasks." *Murphy*, at 1113 (citing *Morillion v. Royal Packing Co.*, 22 Cal.4th 575, 586 (2000)); *see Bono Enterprises, Inc. v. Bradshaw*, 32 Cal.App.4th 968, 975 (Cal.App. 5 Dist. 1995).

It is especially vital for employees working in oil refineries to have 30-minute meal breaks during which they are relieved of all duties because of the stressful and dangerous environment in which they work. Refining oil is an extremely volatile process, using highly flammable and dangerous chemicals, and must be watched at all times. Any mishap at the refinery can result in serious injuries and even death. *See, e.g.*, 3 Crude Manual, TG010016-35 (listing physical and environmental hazards, which can "cause physical injury or death to the operator," and chemical hazards, which can cause death); Critical Operating Limits, TG017588 (1989 explosion at Phillips Petroleum plant killed 23 and injured 100).

### B.  Plaintiffs' Meal Period Claims Are Readily Susceptible to Class-Wide Proof

Employers must provide employees with a 30-minute meal period for every work period in excess of five hours. Cal. Lab. Code § 512; Industrial Welfare Commission Wage Order 1-2001 ("Wage Order 1-2001"), §§ 11(A), (B)[4]. "No employer shall require any employee to work during any meal … period mandated by an applicable [Wage Order]." Cal. Lab. Code § 226.7(a); Wage Order 1-2001, § 11(A). In order to ensure that employers comply with this requirement, and maintain documentary evidence of such compliance, the Wage Order requires every employer to "keep accurate information with respect to each employee" showing when meal periods were taken. Wage Order 1-2001, § 7(A)(3). If a meal period is not provided, the employer "shall pay the employee one additional hour of pay at the employee's regular

---

[4] The Ninth Circuit has held that Wage Orders are "quasi-legislative regulations that are to be interpreted in the same manner as statutes." *Watkins v. Ameripride Servs.*, 375 F.3d 821, 825 (9th Cir. 2004).

1  rate of compensation for each work day that the meal period is not provided." Cal. Lab. Code § 226.7(b);

2  Wage Order 1-2001, § 11(D). Putative class members worked 12-hour shifts while employed by Tesoro;

3  thus, they are entitled to <u>two</u> 30-minute meal periods per shift, during which they must have been

4  relieved of all duties. Cal. Lab. Code § 512(a); *see* Wage Order 1-2001, § 11(C). It is undisputed that

5  Tesoro did not keep records of when meal periods were taken by its employees.

6      The central issue in this case is whether Plaintiffs and putative class members were provided with

7  two 30-minute meal periods relieved of all duty for each 12-hour shift that they worked. Cal. Lab. Code

8  §§ 226.7, 512; Wage Order 1-2001, § 11. In the *USW* case, Judge Klausner found that the plaintiffs, who

9  are both employed by Tesoro, were not relieved of all duty during meal breaks and, therefore, that they

10  were entitled to an extra hour of pay for each shift they worked for Tesoro:

11          If employees are subject to ongoing responsibilities or restrictions over the entire
12      course of their work shifts, the opportunity to take a "meal break" during the shift would
        not comply with the Wage Order [1-2001] if the employees remained subject to these
        responsibilities or restrictions during the break. …
13          **Here, Plaintiffs contend they have not been provided meal periods relieved of**
14      **all duty. Plaintiffs point to requirements to remain in communication at all times,**
        **remain on the Refinery facilities, and refrain from sleeping, reading newspapers, or**
        **watching movies during their breaks.** It is undisputed that supervisors do not keep
15      track of when employee breaks are taken, so work duties may be assigned during any
        point over the shift ….
16          The duties at issue in this case are not restricted to plaintiffs' actual response to
        calls and alarms. **The mere ongoing requirement to remain on the premises at ready**
17      **to respond to calls is a duty in and of itself sufficient to show that plaintiffs were not**
        **relieved of all duty.** Plaintiffs are entitled to compensation under § 226.7 for each of
18      these shifts, not just shifts they can show their breaks were interrupted.

19  Order, pp. 6-7, Ex. A to RJN. In arriving at this conclusion, Judge Klausner relied on Tesoro's same

20  uniform policies and practices that are present at the Golden Eagle refinery, which require putative class

21  members to remain in communication at all times, stay on the refinery premises, and refrain from doing

22  anything that would interfere with their ability to monitor their units and respond to conditions in their

23  units during their shifts. Plaintiffs here will present evidence that these policies and practices prevented

24  them and putative class members from being relieved of all duty at any time during their work shifts.

25      As explained below, Tesoro will likely argue that class action treatment is not appropriate because

26  of alleged differences among putative class members' job classifications, duties, and wage rates, as well

27  as other alleged differences among the various units. Judge Klausner's summary judgment order shows

28  that these alleged differences are irrelevant to the class certification issue and the ultimate determination

of liability. This is supported by Judge Klausner's finding of liability against Tesoro based on policies and restrictions applicable to all shift employees, irrespective of any differences in their job duties. Order, Ex. A to RJN, pp. 6-7 (granting summary judgment in favor of plaintiffs on the same grounds, even though one is a Field Operator in the Fluid Catalytic Cracking Unit and the other is an Inside Head Pumper in Receiving, Pumping & Shipping, each with different job duties). Therefore, it is evident that Plaintiffs' class claims in this case are susceptible to classwide proof.

## VI.    CLASS CERTIFICATION IS APPROPRIATE IN THIS CASE

A party seeking to certify a class must show that the requirements of Rule 23(a) and (b) are met. *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). "Although certification inquiries … might properly call for some substantive inquiry [into the merits of a suit], the court may not go so far ... as to judge the validity of those claims." *United Steel, et al. v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010) (finding that the district court abused its discretion by declining certification based on the possibility that plaintiffs would not prevail on the merits of their "on duty" theory).

### A.    The Proposed Class and the Claims Plaintiffs Seek to Litigate on a Classwide Basis

Plaintiffs seek to certify a claim for violations of the Unfair Competition Law ("UCL") and failure to provide meal periods, on behalf of a class defined as:

> All current and former shift employees of Defendant Tesoro Refining and Marketing Company who worked at least one 12-hour shift, excluding any shifts worked as temporary shift supervisors since April 25, 2004, at the Golden Eagle refinery and chemical plant operated by Defendant.

Plaintiffs also seek to certify a subclass for failure to pay all wages due at the time of discharge or resignation, as required by California Labor Code sections 201, 202, and 203, defined as:

> All former shift employees of Defendant Tesoro Refining and Marketing Company who worked at least one 12-hour shift, excluding any shifts worked as temporary shift supervisors, since April 25, 2004, at the Golden Eagle refinery and chemical plant operated by Defendant, and whose employment has been terminated by discharge or resignation.

As will be shown, the proposed class satisfies all of the requirements of Rule 23.

### B.    The Statutory Period for This Action Was Tolled By the Pendency of the *USW* Case

In *American Pipe and Constr. Co. v. Utah*, 414 U.S. 538, 553 (1974), the Supreme Court held that "the commencement of [a] class suit tolls the running of the statute for all purported members of the class who make timely motions to intervene after [class certification is denied]." In *Crown, Cork & Seal Co. v.*

1  *Parker*, 462 U.S. 345, 350 (1983), the Court extended this holding to all asserted members of the class.

2  "Thus, the commencement of a class action suspends the applicable statute of limitations for all asserted

3  members of the class who would have been parties had the suit been permitted to continue as a class

4  action until such time as class certification is denied." Order, Ex. E to RJN, p. 10.

5       Alternatively, California's equitable tolling principles apply to Plaintiffs' claims. Equitable tolling

6  "operates to suspend or extend a statute of limitations in order to ensure that a limitations period is not

7  used to bar a claim unfairly." *Hatfield v. Halifax*, 564 F.3d 1177, 1185 (9th Cir. 2009). In the *Gardner*

8  action, filed on behalf of 12-hour shift employees at Shell's Martinez refinery, the Honorable Claudia

9  Wilken concluded that equitable tolling principles apply in that case, for the following reasons:

10      [The *USW* case] was filed in April, 2008 and provided Defendants with timely notice of
    Plaintiffs' claims in the present case .... Defendants suffer no prejudice in gathering

11      evidence to defend against the present case because the present case is narrower than the
    *USW* case. Plaintiffs in the present case exhibited good faith and reasonable conduct by

12      filing the complaint here less than three months after the district court denied class
    certification in [the *USW* case].

13          Moreover, the equitable tolling of the statute of limitations in this case is
    consistent with California's strong public policy in favor of class actions. ... In many

14      ways, the present case is merely a continuation of the *USW* case because Plaintiffs
    have pursued their claims vigorously since the filing of that case in April 25, 2004. Therefore,

15      the Court allows Plaintiffs to pursue the claims of putative class members back to April
    25, 2004.

16  Order, Exh. E to RJN, pp. 11-12. Therefore, based on *American Pipe*, *Crown*, and California's equitable

17  tolling principles, Plaintiffs should be allowed to pursue their class claims back to April 25, 2004.

18      **C.**    **This Action Satisfies All of the Requirements of Rule 23(a)**

19      Rule 23(a) provides four requirements that must be satisfied in any class action: (1) numerosity;

20  (2) commonality; (3) typicality; and (4) adequacy of the representatives. Fed. R. Civ. P. 23(a).

21          1.    <u>The Class is Sufficiently Numerous</u>

22      "The prerequisite of numerosity is discharged if the class is so large that joinder of all members is

23  impracticable." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). Courts have found that

24  joinder is impracticable in cases with as few as 40 class members. *Ikonen v. Hartz Mountain Corp.*, 122

25  F.R.D. 258, 262 (S.D. Cal. 1988). Numerosity is presumed without controversy where there are at least

26  100 proposed plaintiffs. *Wang v. Chinese Daily News*, Inc., 231 F.R.D. 602, 607 (C.D. Cal. 2005). Tesoro

27  removed this action pursuant to the Class Action Fairness Act, which requires that the proposed class

28  include at least 100 members. 28 U.S.C. §1332(d)(5)(B). Tesoro estimated that at the Golden Eagle

refinery, there are currently approximately 250 to 300 12-hour shift employees. *See* Hanson Tr. 124:21-125:4. The numerosity requirement is satisfied for the subclass, as it is estimated that there are about 60 12-hour shift employees who have separated from their employment since 2004. Clark Decl. ¶ 4.

2. <u>Common Issues of Law and Fact Exist Under Rule 23(a)(2)</u>

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Ninth Circuit construes Rule 23(a)(2) "permissively," and has held that the requirements necessary for a finding of commonality are "minimal." *Hanlon*, 150 F.3d at 1019-20. "All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.* at 1019. "[F]or the commonality requirement to be met, there must only be one single issue common to the proposed class." *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 647 (C.D. Cal. 1996). Here, there are numerous common questions of law and fact, including but not limited to:

- What are an employer's obligations to provide a 30-minute meal period relieved of all duty for each work period in excess of five hours, pursuant to California Labor Code sections 226.7, and 512 and Wage Order 1-2001, section 11?

- Does Tesoro's policy of requiring Operators to remain on the refinery premises and in close proximity to their work areas at all times during their shifts deprive putative class members of 30-minute meal periods relieved of all duty?

- Does Tesoro's policy of requiring Operators to remain in constant communication with co-workers and supervisors via company radio or telephones throughout their shifts deprive putative class members of 30-minute meal periods relieved of all duty?

- If Tesoro did not pay former employees one hour of premium pay for each shift during which they were subject to the above requirements and restrictions, is it liable for waiting-time penalties under California Labor Code sections 201-203?

- Is Tesoro's compensation system, including the absence of codes to record missed meal breaks in the Labor Tracking System and the absence of pay for missed breaks, consistent with its obligation under state law to provide meal breaks to its employees?

These common questions have been found to be sufficient to satisfy Rule 23(a)(2). *See Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625, 633 (S.D. Cal. 2010) ("whether Defendants' policies deprived the putative class members of meal periods" and "Defendants' obligations under California Labor Code §§ 201-03, … 226.7, 512" are sufficiently common legal and factual questions for purposes of 23(a)(2)).

3. <u>The Proposed Class Representative's Claims Are Typical of Those of the Class</u>

Plaintiffs move the Court to appoint Plaintiffs Paul Gutierrez, Sal Lucido, April Moore, Charles Grimmett, Antonio Garcia, and Brian Cashwell ("Representative Plaintiffs") as class representatives. The

1   claims of Plaintiff Rick Delagarza will remain pending as individual, not representative, claims. Rule
2   23(a)(3) requires that the class representatives be members of the class they purport to represent and
3   "possess the same interest and suffer the same injury" as putative class members. *General Telephone Co.*
4   *of Southwest v. Falcon*, 457 U.S. 147, 156 (1982). The typicality requirement is fulfilled if "the claims or
5   defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P.
6   23(a)(3). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably
7   co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150
8   F.3d at 1020. Assessing typicality involves: (1) whether other members have the same or similar injury as
9   the class representatives; (2) whether the action is based on conduct which is not unique to the class
10  representative; and (3) whether other class members have been injured by the same course of conduct.
11  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

12          Here, the Representative Plaintiffs and other members of the proposed class suffered the same
13  injury from Tesoro's uniform policies, which deprived them of 30-minute meal periods relieved of all
14  duty, and claim identical relief – an additional hour of pay for each 12-hour shift that they worked for
15  Tesoro since April 25, 2004. Plaintiff Grimmett and other former employees of the Golden Eagle refinery
16  also claim waiting-time penalties because they were not paid the additional hour of wages for missed
17  meal periods at the time of discharge or resignation. Plaintiffs' claims are based on Tesoro's common
18  policies applicable to all 12-hour shift employees, which required putative class members to remain on
19  duty throughout their shifts, to stay in the refinery and in communication at all times, and refrain from
20  doing anything that would interfere with their ability to monitor their units and respond to conditions in
21  their units during their shifts. Therefore, Plaintiffs' claims are typical of those of the class.

22                  4.      The Class Representative and Class Counsel Are Adequate

23          Finally, Rule 23(a)(4) requires that the class representatives "fairly and adequately protect the
24  interests of the class." Fed. R. Civ. P. 23(a)(4). The proposed class representatives (1) must not have any
25  conflicts of interest with other class members, and (2) must be represented by qualified and competent
26  counsel who will prosecute the action vigorously on behalf of the class. *Hanlon*, 150 F.3d at 1020; *Staton*
27  *v. Boeing Co.*, 327 F.3d 938, 958 (9th Cir. 2003). In appointing class counsel, the court must consider:
28  (1) work in identifying or investigating potential claims; (2) counsel's experience handling class actions,

other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources counsel will commit to representing the class. Fed. R. Civ. P. 23(g).

Here, there is no evidence of any conflict or antagonism between the Representative Plaintiffs, their counsel, and the putative class. The Representative Plaintiffs have been informed that their attorneys also represent the USW, which is paying a maintenance fee to partially finance this lawsuit, but that they would control the litigation, and they have consented to such representation to writing. Fang Decl. ¶ 6. In addition, Plaintiffs' attorneys are experienced in wage and hour law and class action litigation. *See* Fang Decl. ¶ 2-4; Smith Decl. ¶¶ 3-6; Rouco Decl. ¶¶ 2-8. The Representative Plaintiffs have shown that they are willing to vigorously pursue this action by attending depositions or committing to attend depositions, remaining in communication with and providing information about the case to their attorneys on a regular basis, and staying apprised of the status of the lawsuit. Fang Decl. ¶ 8. Plaintiffs' attorneys have shown the same vigor in pursuing this action by effectively engaging in law and motion practice before this Court, serving discovery, and taking and defending 15 depositions in the action to date. *Id*. at ¶ 7. Therefore, the Representative Plaintiffs and their attorneys are adequate representatives of the class.

**D.  This Action Satisfies All of the Requirements of Rule 23(b)(3)**

Certification is appropriate under Rule 23(b)(3) where "common questions … 'predominate over any questions affecting only individual members,' and class resolution [is] 'superior to other available methods for the fair and efficient adjudication of claims.'" *Hanlon*, 150 F.3d at 1022.

1.  Common Questions Predominate As to Plaintiffs' Meal Period Claims

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "In undertaking the predominance analysis, courts must identify the issues involved in the case and determine which are subject to generalized proof, and which must be the subject of individualized proof." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166, at *6 (N.D. Cal.).

Here, Plaintiffs will be able to prove with common evidence that Tesoro's uniform policies which required all 12-hour shift employees to remain on duty throughout their work shifts, stay on the refinery premises and in communication at all times, and refrain from doing anything that would interfere with their ability to monitor their units and respond to conditions in their units during their shifts prevented

them from taking off-duty 30-minute meal periods. Such evidence will take the form of written policies and testimony of Tesoro's representatives. *See* Section IV, *supra*.

Plaintiffs anticipate that Tesoro will then argue that class certification is not appropriate because any liability determination will require individualized inquiries into the job duties of each class member, the amount of "downtime" they had each shift during which they would have had opportunities to eat, and the extent to which their meal periods were interrupted by radio calls or alarms and whether immediate response was required. This argument misunderstands the facts and the applicable law and has been rejected by three federal district judges who have considered it:

(1) Judge Klausner in the *USW* case:

Defendants argue that it is an unresolved fact question to what extent plaintiffs' meal breaks were interrupted by radio calls or console alarms requiring them to immediately respond. This argument is unavailing. The duties at issue in this case are not restricted to plaintiffs' actual response to calls and alarms. The mere ongoing requirement to remain on the premises at ready to respond to calls is a duty in and of itself sufficient to show that plaintiffs were not relieved of all duty. Plaintiffs are entitled to compensation under § 226.7 for each of these shifts, not just shifts they can show their breaks were interrupted.

Order, p. 7 (emphasis added), Ex. A to RJN;

(2) Judge Fairbank in the action on behalf of shift employees at Tesoro's Los Angeles refinery:

Plaintiffs contend that the duties in this case are not restricted to Plaintiffs' actual responses to calls and alarms, but instead that the mere ongoing requirement to remain on premises at ready to respond to calls constitutes a duty in and of itself. The Court finds that Plaintiffs have provided sufficient evidence in support of their contentions. …

Tesoro contends that … the amount of responsibilities in each shift varies, including (1) whether workers must monitor their units, (2) the extent to which "restrictions" apply, and (3) the frequency of radio, phone, or alarm interruption. Although Tesoro presents some evidence that there may be variance in the positions as to the total amount of down time [citation] or amount of responsibilities in any given shift [citation], Tesoro does not present sufficient evidence that individual questions predominate under Plaintiffs' actual theory, which is based on Tesoro's purported general policies and the nature of the job requirements for a 12-hour shift worker in one of the three types of jobs included in the putative class. [Citation.]

Order, pp. 7-8, Ex. C to RJN.

(3) Judge Wilken in the action on behalf of shift employees at Shell's Martinez refinery:

The Court: [H]ere, the plaintiffs' claim is simply that … twelve-hour shift workers and only on non-supervisoral shifts, are all subject to one particular policy, which includes not only not leaving the site, but also several other stipulations. … [T]hen everybody, regardless of whether they were, you know, proving the Pythagorean Theorem or cleaning toilets, is subject to the policy that they can't leave the premises, they can't read a newspaper …. And that's the operative point here: Did they have a set time when they didn't have other duties. Now, the fact that they might have had some other time when, as it turned out in retrospect, they didn't have any other duties, that just isn't how it works.

1    Transcript of Class Cert. Hrg, 3:18-4:21, Ex. 4 to Fang Decl.

2          The Ninth Circuit has held that the class certification issue must be decided based on whether

3    "plaintiffs' *actual* legal theory … was one in which common issues of law or fact … predominate over

4    individual questions," <u>not</u> on whether plaintiffs would ultimately prevail on the merits of their legal

5    theory." *ConocoPhillips*, 593 F.3d at 808. Here, Plaintiffs' "on duty" theory is that putative class

6    members are never "relieved of all duty" because they are subject, throughout their shifts, to uniform

7    policies requiring them to stay in the refinery and near their work areas, remain in constant

8    communication, respond to alarms at all times, and refrain from engaging in any activities that would

9    interfere with their ability to monitor their units. This situation, in which an employee is <u>never</u> allowed to

10   turn off his radio, walk away from his work area, and say, "I am on my lunch break for the next 30

11   minutes," is not – and has never been – compliant with California's meal period laws. Therefore,

12   common questions predominate as to Plaintiffs' claims, and the requirements of Rule 23(b)(3) are met.

13                   2.      <u>Class Action Treatment is the Superior Method for Adjudicating This Case</u>

14         Rule 23(b)(3) also requires that class resolution must be "superior to other available methods for

15   the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). California has a strong

16   "public policy that encourages the use of the class action device." *Sav-On Drug Stores v. Superior Court*,

17   34 Cal. 4th 319, 340 (2004). There is no better evidence that the instant case should proceed on a class-

18   wide basis than the fact that if absent class members were to bring their claim individually, they would

19   rely on the <u>same</u> evidence – of Tesoro's policies requiring them to remain at the refinery, stay in constant

20   communication, and refrain from engaging in activities that would interfere with their ability to respond

21   to conditions in their units – to prove their claims. In addition, precluding Plaintiffs from litigating the

22   meal period claims on behalf of other employees would be inefficient, wasteful, and unfair; and it would

23   force putative class members to bring hundreds of individual claims to vindicate their rights, which will

24   drain limited judicial resources and result in an inefficient and wasteful process.

25         Moreover, the putative class members here have little or no interest in individually controlling the

26   prosecution or defense of separate actions, given that the USW is funding the litigation and their interests

27   will be adequately protected by the Representative Plaintiffs and their attorneys. Further, it is desirable to

28   concentrate the litigation of the class meal period claims in this forum because the Golden Eagle refinery

is located in this judicial district, all the relevant events took place within this district, the employees, witnesses, and evidence are located in this district, and the CBA was negotiated, executed, and performed here. Finally, a class trial here will be manageable because Plaintiffs will present evidence of Tesoro's uniform policies in the form of written policies and records, testimony from Tesoro's representatives, and representative evidence extrapolated to the class from a random sample of class members.

### E.   The Proposed Class is Also Appropriately Certified Under Rule 23(b)(2)

Certification under Rule 23(b)(2) is appropriate "if the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(2) certification is appropriate here because Plaintiffs challenge policies that apply uniformly to the class as a whole, classwide injunctive and declaratory relief requiring Tesoro to provide 12-hour shift employees meal periods relieved of all duty would prospectively benefit the class, and injunctive and declaratory relief are necessary to ensure Tesoro's future compliance with California law, given Tesoro's past and continuing conduct concerning meal breaks and given that to date it has not provided evidence that it has changed its unlawful practices or conceded that its practices are unlawful. *See Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 754 (9th Cir. 2010). Further, here, monetary relief does not determine the procedures used and will not require individualized hearings, and the amount owed to class members can be determined by a straightforward mathematical calculation that requires only the number of 12-hour shifts worked during the class period and the class member's regular hourly rate of pay.

## VII.   CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court certify this action as a class action, appoint Plaintiffs Gutierrez, Lucido, Moore, Grimmett, Garcia, and Cashwell as the class representatives, and certify Jay Smith and Linda S. Fang of Gilbert & Sackman, A Law Corporation, and Richard P. Rouco of Quinn, Connor, Weaver, Davies & Rouco as co-lead counsel for the class.

Dated:  April 18, 2011              **GILBERT & SACKMAN, A Law Corporation**

                                    By:    _/s/ Linda S. Fang_
                                    Linda S. Fang

                                    **QUINN, CONNOR, WEAVER, DAVIES & ROUCO**
                                    Richard P. Rouco

                                    Attorneys for Plaintiffs

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### CERTIFICATE OF SERVICE

I, Linda S. Fang, certify that on <u>April 18, 2011</u>, the foregoing document entitled:

### PLAINTIFF'S NOTICE OF MOTION AND MOTION
### FOR CLASS CERTIFICATION

was filed electronically in the Court's ECF; thereby upon completion the ECF system automatically generated a "Notice of Electronic Filing" ("NEF") as service through CM/ECF to registered e-mail addresses of parties of record in the case, in particular on the following:

Timothy M. Rusche
trusche@seyfarth.com

William Dritsas
wdritsas@seyfarth.com

Sara Poggi
spoggi@seyfarth.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on April 18, 2011, at Los Angeles, California.

       /s/  Linda S. Fang
       Linda S. Fang

Case No. C 09-05803 MHP